| | | |
|---|---|---|
| ALICIA CARTER<br>669 Pennsylvania Avenue<br>Brooklyn, New York 11207; | * <br> * | IN THE DEC 22 PM 1:14<br>CIRCUIT COURT DIVISION |
| and | * | FOR |
| DARRIN CARTER<br>669 Pennsylvania Avenue<br>Brooklyn, New York 11207; | *<br>* | BALTIMORE CITY<br>CASE NO.:_____ |
| Plaintiffs, | * | |
| v. | * | |
| HARBOR HOSPITAL, INC.,<br>D/B/A MEDSTAR HARBOR HOSPITAL<br>3001 South Hanover Street<br>Baltimore, Maryland 21225; | *<br>*<br>* | |
| Serve On:<br>The Corporation Trust, Incorporated<br>351 West Camden Street<br>Baltimore, Maryland 21201 | *<br>*<br>* | |
| And | * | |
| MEDSTAR AMBULATORY<br>SERVICES, INC.<br>5565 Sterrett Place, 5th Floor<br>Columbia, MD 21044; | *<br>*<br>* | |
| Serve On:<br>The Corporation Trust, Incorporated<br>351 West Camden Street<br>Baltimore, Maryland 21201 | *<br>*<br>* | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

Plaintiffs, by and through their undersigned counsel and pursuant to the Maryland Rules of Civil Procedure, hereby submit this Complaint and Demand for Jury Trial against Harbor

EXHIBIT A

Hospital, Inc., d/b/a MedStar Harbor Hospital, and MedStar Ambulatory Services, Inc., and state as follows:

## JURISDICTION & VENUE

1. Plaintiffs fully complied with the requirements of the Health Care Malpractice Claim Act, Md. Code Ann., Cts & Jud. Proc. § 3-2A-01, *et seq.*, prior to filing this suit. *See* Order of Transfer, **Ex. 1**.

2. The Circuit Court for Baltimore City has jurisdiction over this cause of action pursuant to Md. Code Ann, Cts. & Jud. Proc. §§ 6-102 and 6-103. The amount in controversy exceeds Thirty Thousand Dollars ($75,000.00), exclusive of interest and costs.

3. Venue for this action is proper in Baltimore City, Maryland, pursuant to Md. Code. Ann., Cts. & Jud. Proc. § 6-201(a). At all relevant times, the Defendants, either directly and/or through their actual and/or apparent agents, servants, and/or employees, carried on regular business in, resided in, and/or maintained principal offices in Baltimore City.

## PARTIES

4. At all times herein relevant, Plaintiff Alicia Carter (hereinafter, "Mrs. Carter") was a patient of Dr. Fateh Hraky, MedStar Harbor Hospital, Inc., and MedStar Ambulatory Services, Inc., all of whom treated Mrs. Carter at the MedStar Harbor Hospital facility, and which undertook the duty to provide the medical services and treatment necessary for her health and wellbeing.

5. At all times herein relevant, Harbor Hospital, Inc., doing business as MedStar Harbor Hospital, was a Defendants located at 3001 South Hanover Street, Baltimore, Maryland 21225, and, by its agents, servants, and employees, regularly offered medical services and care to patients and residents in Baltimore City, Maryland.

2

6. At all times herein relevant, MedStar Ambulatory Services, Inc. was a Defendant located at 5565 Sterrett Place, 5th Floor, Columbia, Maryland, 21044 and, by its agents, servants, and employees, regularly offered medical services and care to patients and residents in Baltimore City, Maryland.

### STATEMENT OF FACTS

7. At all times relevant hereto, Mrs. Carter was a patient of Defendants and saw Dr. Fateh Hraky as her gynecologist.

8. Dr. Fateh Hraky is an agent, servant, and/or employee of Harbor Hospital, Inc., d/b/a MedStar Harbor Hospital, and at all relevant times was acting within the scope of his employment and authority. Accordingly, Harbor Hospital, Inc. is vicariously liable for any of negligent acts and/or omissions committed by Dr. Hraky during his care of Mrs. Carter and which caused Mrs. Carter's injuries.

9. Cynthia Budd, a medical technician who, at the time of the subject incident, was working with Dr. Hraky in his office, is an agent, servant, and/or employee of MedStar Ambulatory Services, Inc., and at all relevant times was acting within the scope of her employment and authority. Accordingly, MedStar Ambulatory Services, Inc. is vicariously liable for the negligent acts and/or omissions committed by Ms. Budd and which caused Mrs. Carter's injuries.

10. On or about the summer of 2015, Mrs. Carter received abnormal pap smear results, showing suspicion of low-grade squamous intraepithelial lesion (LGSIL). Following these results, Dr. Hraky advised Mrs. Carter to undergo a colposcopy for further examination. Mrs. Carter consented to the colposcopy.

11. At no point did Defendants convey that they would not be able to adequately and appropriately perform the colposcopy, and instead, represented that it would be able to care for Mrs. Carter's full needs.

12. During a colposcopy, a gynecologist conducts a detailed examination of the patient's cervix and vaginal fornices. First, the doctor examines the cervix by exposing it with a speculum and assessing any obvious abnormalities. Then, he/she may apply either normal saline or 3-5% acetic acid, vinegar, to the cervix to look for surface abnormalities and examine the cervical capillaries and surface blood vessels. The doctor may also use an iodine solution to determine if any vaginal lesions are present. If the doctor deems it necessary, he/she may obtain samples from the cervix, for example, through a biopsy or endocervical curettage, to be subsequently tested by a pathologist.

13. On approximately August 14, 2015, Dr. Hraky was scheduled to perform a colposcopy upon Mrs. Carter. Mrs. Carter was placed in a dorsal lithotomy position and a speculum was inserted into her cervix for the initial examination.

14. Following the initial examination, Dr. Hraky had planned to apply a 3% acetoacetic acid solution to Mrs. Carter's cervix to further examine any abnormalities as the next step of the colposcopy. In preparation for this procedure, Cynthia Budd prepared the solutions, materials, and tools that Dr. Hraky would use.

15. However, Dr. Hraky's assistant, Cynthia Budd, handed him, instead of a 3% acetoacetic acid solution, 85% trichloroacetic acid (TCA), which Dr. Hraky applied to Mrs. Carter's cervix.

16. TCA is used for the chemoablation of genital warts, and is also often used for cosmetic treatments such as tattoo removal or chemical peels.

4

17. Almost immediately after Dr. Hraky applied the TCA, Mrs. Carter began complaining of severe burning, as her cervix, vagina and labial areas discolored into a solid white color. At this point, Dr. Hraky realized he had used TCA, and Mrs. Carter was washed with saline solution many times. She was then discharged, prescribed pain medication, and advised to follow up with Dr. Hraky.

18. However, because Dr. Hraky applied 85% TCA instead of 3% acetoacetic acid to Mrs. Carter's cervix, she suffered long-lasting and egregious harm. Mrs. Carter suffered severe pain, burning, and discoloration, not only immediately after the application of the dangerous acid, but also in the aftermath of her appointment, and still continues to suffer today.

19. The acid burn and resulting injury also made intercourse with her husband impossible for several months and she continues to experience extreme pain during and after intercourse. Her injuries are permanent.

## CAUSES OF ACTION

### Count 1: Medical Negligence

### Plaintiff Alicia Carter Against All Defendants

20. Mrs. Carter adopts and incorporates herein by reference the allegations set forth in all preceding paragraphs, as if fully stated herein.

21. At all times relevant hereto, the agents, servants, and/or employees of Harbor Hospital, Inc., d/b/a MedStar Harbor Hospital, acted as agents, servants, and/or employees (actual or apparent), and within the scope of their agency with, of MedStar Ambulatory Services, Inc., and vice versa. Therefore, Defendants are vicariously liable for the negligent actions and/or inactions of one another.

22. Defendants and their agents, servants, and/or employees represented to Mrs.

5

Carter that they possessed that degree of skill, knowledge, and ability possessed by other reasonably competent medical providers operating under the same or similar circumstances as those involving the Mrs. Carter

23. Defendants, by and through their various actual and/or apparent agents, servants, and/or employees, owed a duty of care to Mrs. Carter to adequately supervise, monitor, and control the actions of their agents, servants, and/or employees in general, and to exercise the degree of skill, attention, and care, through their agents, servants, and/or employees, that is required of other reasonably competent medical providers. This duty included, but was not limited to, conducting a colposcopy safely and properly and act with the care and prudence required of professionals conducting such a procedure.

24. Defendants, by and through their various actual and/or apparent agents, servants, and/or employees, breached their duties to Mrs. Carter, and caused, permitted, and allowed the following acts of medical negligence to occur in the care and treatment of Mrs. Carter:

    a) Failing to develop, implement, and update an adequate and appropriate safety plan that would prevent the use of an incorrect and dangerous solution on a patient during a gynecological procedure;

    b) Failing to adequately and properly hire, train, and retain its employees so that those employees did not use an incorrect and dangerous solution on a patient during a gynecological procedure;

    c) Failing to adequately and properly supervise and monitor its employees in order to prevent them from using an incorrect and dangerous solution on a patient during a gynecological procedure;

    d) Failing to read the label on the solution before using it and applying it on a

patient;

e) Failing to recognize that solution used, prior to applying it on the patient, was 85% trichloroacetic acid instead of 3% acetoacetic acid; and

f) Using 85% trichloroacetic acid instead of 3% acetoacetic acid upon a patient during a colposcopy.

25. As a direct and proximate result of the aforementioned deviations from the applicable standards of care by Defendants, Mrs. Carter suffered severe pain, burning, and discoloration, not only immediately after the application of the dangerous acid, but also in the aftermath of her injury, and still continues to suffer today. The acid burn and resulting injury also made intercourse impossible in the first few months, and since then, up until now, extremely painful.

26. As a direct and proximate result of the aforementioned deviations from the applicable standards of care by Defendants, Mrs. Carter sustained mental anguish, emotional pain and suffering, physical pain and suffering, and loss of conjugal relationship, as well as medical and other expenses.

27. Had Defendants complied with the applicable standards of care, Mrs. Carter would not have suffered these injuries.

28. Mrs. Carter's injuries, damages, and losses, were directly and proximately caused by the negligence and violations of the applicable standards of care by Defendants with no negligence on the part of Mrs. Carter herself or any other plaintiffs in this action.

WHEREFORE, Plaintiff demand compensatory damages against Defendants in an amount in excess of Thirty Thousand Dollars ($30,000.00).

### Count II: Loss of Consortium

### All Plaintiffs Against All Defendants

29. Plaintiffs adopt and incorporate herein by reference the allegations set forth in all preceding paragraphs, as if fully stated herein.

30. At all times relevant hereto, the agents, servants, and/or employees of Harbor Hospital, Inc., d/b/a MedStar Harbor Hospital, acted as agents, servants, and/or employees (actual or apparent), and within the scope of their agency with, of MedStar Ambulatory Services, Inc., and vice versa. Therefore, Defendants are vicariously liable for the negligent actions and/or inactions of one another.

31. Defendants and their agents, servants, and/or employees represented to Mrs. Carter that they possessed that degree of skill, knowledge, and ability possessed by other reasonably competent medical providers operating under the same or similar circumstances as those involving the Mrs. Carter

32. Defendants, by and through their various actual and/or apparent agents, servants, and/or employees, owed a duty of care to Mrs. Carter to adequately supervise, monitor, and control the actions of their agents, servants, and/or employees in general, and to exercise the degree of skill, attention, and care, through its agents, servants, and/or employees, that is required of hospitals in general. This duty included, but was not limited to, conducting a colposcopy safely and properly and act with the care and prudence required of professionals conducting such a procedure.

33. Defendants, by and through their various actual and/or apparent agents, servants, and/or employees, breached their duties to Mrs. Carter, and caused, permitted, and allowed the following acts of medical negligence to occur in the care and treatment of Mrs. Carter:

a) Failing to develop, implement, and update an adequate and appropriate safety

plan that would prevent the use of an incorrect and dangerous solution on a patient during a gynecological procedure;

b) Failing to adequately and properly hire, train, and retain its employees so that those employees did not use an incorrect and dangerous solution on a patient during a gynecological procedure;

c) Failing to adequately and properly supervise and monitor its employees in order to prevent them from using an incorrect and dangerous solution on a patient during a gynecological procedure;

d) Failing to read the label on the solution before using it and applying it on a patient;

e) Failing to recognize that solution used, prior to applying it on the patient, was 85% trichloroacetic acid instead of 3% acetoacetic acid; and

f) Using 85% trichloroacetic acid instead of 3% acetoacetic acid upon a patient during a colposcopy.

34. As a direct and proximate result of the aforementioned deviations from the applicable standards of care by Defendants, Mrs. Carter suffered severe pain, burning, and discoloration, not only immediately after the application of the dangerous acid, but also in the aftermath of her appointment, and still continues to suffer today. The acid burn and resulting injury also made intercourse impossible in the first few months, and since then, up until now, extremely painful.

35. At the time of this incident, Mrs. Carter was married to Darrin Carter. They were married in the summer of 2014 and continued to be married up until this incident.

36. As a direct and proximate result of the aforementioned deviations from the

applicable standards of care by Defendants, Plaintiff suffered injuries to their marital relationship, including loss of conjugal relationship.

37. Had Defendants complied with the applicable standards of care, Plaintiffs would not have suffered these injuries.

**WHEREFORE**, the Plaintiffs demand compensatory damages against Defendants in an amount in excess of Thirty Thousand Dollars ($75,000.00).

Respectfully submitted,

_____
William H. Murphy, Jr.
Nicholas A. Szokoly
Jessica H. Meeder
Murphy, Falcon & Murphy, P.A.
One South Street, 23rd Floor
Baltimore, Maryland 21202
T: 410-951-8744
F: 410-539-6599
E: nick.szokoly@murphyfalcon.com
*Attorneys for Plaintiffs*

## REQUEST FOR JURY TRIAL

Plaintiffs respectfully request a jury trial.

Respectfully submitted,

_____
Nicholas Szokoly, Esquire